O

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **CITY OF COLLEGE STATION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. H-04-4558** |
| | § | |
| **UNITED STATES DEPARTMENT OF** | § | |
| **AGRICULTURE, ET AL.** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM & ORDER

Pending before the Court is Plaintiff the City of College Station's request for preliminary injunctive relief (Dkt. #1). The Court held a preliminary injunction hearing on March 15, 2005. After considering the arguments, the administrative record, and the applicable law, the Court is of the opinion that Plaintiff's request for preliminary injunctive relief should be GRANTED.

### Factual and Procedural Background

Plaintiff filed this lawsuit on December 3, 2004, against Defendants United States Department of Agriculture ("USDA") and the Rural Utilities Service ("RUS") (Collectively "Federal Defendants"), and against the Wellborn Special Utility District ("Wellborn").[1] Wellborn is a home-rule city organized under Article XI, section 5, of the Constitution of the State of Texas. The USDA is an agency of the United States government. The RUS is an agency of the USDA. The complaint was filed pursuant to the Administrative Procedure Act, 5 U.S.C. § 702 ("APA"), the Mandamus Act, 28 U.S.C. § 1361, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Federal Question Jurisdictional Amendments Act of 1980, 28 U.S.C. § 1331. The Plaintiff seeks mandamus

---

[1] The Federal Defendants and Wellborn may hereinafter be referred to collectively as "Defendants."

and injunctive relief, requesting the Court to compel an officer or employee of the Federal Defendants to perform a duty owed to the Plaintiff, specifically to refrain from lending money to Wellborn.  Plaintiff alleges that the Federal Defendants violated 7 C.F.R. § 1780.1 *et seq.*, the Federal Defendants' policies and procedures for making and processing direct loans and grants for water projects, when it agreed to fund a loan to Wellborn.

This case arises in the context of the Consolidated Farm and Rural Development Act (Consolidated Farms Home Administration Act of 1961) 7 U.S.C. § 1926, which was enacted in 1961 as part of a statutory framework designed to provide federal loans to rural water associations. Note, *Water Associations and Federal Protection under 7 U.S.C. § 1926(b): A Proposal to Repeal Monopoly Status*, 80 TEX. L. REV. 155, 157-60 (2001) (outlining the history of 7 U.S.C. § 1926(b)). The program is designed to serve entities that cannot qualify for comparable loans in the private sector.  *See* 7 C.F.R. § 1780.7(d).  In recognition of the fact that borrowers who qualify for this program serve the "most financially needy communities," 7 C.F.R. § 1780.2, the statute assumes they may need assistance to avoid interference with the revenue stream that will be the source for repaying the loan.  Accordingly, § 1926(b) protects borrowers under the program against loss of their customers or service areas to cities or other entities that annex part of that service area.  Section 1926(b) states:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

7 U.S.C. § 1926(b).  Unless waived by the borrower and the USDA, the § 1926(b) protection remains in effect for the entire term of the loan, which is commonly 40 years.  That protection

affects persons who seek to develop land served by a borrower under the program as well as cities adjacent to those areas.  Plaintiff argues that, due to § 1926(b) protection, rural water systems like Wellborn are generally able to prevent the unconsented transfer of territory within their service area. Plaintiff contends that this puts rural water systems with § 1926(b) protection in a monopolistic position, making it possible for them to overcharge municipalities for the opportunity to serve newly developed areas.

As early as 1971, Wellborn and its predecessor, Wellborn Water Supply Corporation ("Wellborn WSC"), had a water purchase agreement with Texas A&M University (the "University"). In 1992, Wellborn WSC entered into a water supply contract with the Plaintiff.  The Plaintiff committed itself to provide Wellborn WSC with water.  In the contract, Wellborn WSC agreed "as part of the consideration for the execution of [the] Agreement . . . to allow [the Plaintiff] to provide the water service to any area annexed by [the Plaintiff] without separate charge."

In 1998, Wellborn assumed four debts owed by Wellborn WSC to the USDA.  Between 1966 and 1986, the USDA made these four loans to Wellborn WSC pursuant to 7 U.S.C. § 1926.  Among the transferred debts were four 40-year notes payable to the USDA.  Plaintiff alleges that the outstanding balance on the notes is currently about $500,000.  Upon assumption of the four debts, Wellborn received protection afforded by § 1926(b).

Additionally, as early as 1998, Wellborn acquired leases to explore for a new water source so that it could supply its own water.  By the summer of 2002, new wells were in service along with the necessary pump stations and transmission lines.  A million gallon overhead storage facility was also constructed as part of the new system.  In 2001, the University notified Wellborn that it had elected to not continue as a regular water supplier.  Thereafter, the University would supply water only in emergency situations.

3

The Brushy Water Supply Corporation ("Brushy WSC") is another rural water facility that is separated from Wellborn by land owned by the University. By late 2002, Brushy WSC was faced with a need to enhance its storage capacity and water pressure to meet its service obligations and requirements imposed by the Texas Commission on Environmental Quality (the "TCEQ"). Wellborn's excess overhead storage capacity was identified as the most expedient and cost saving method to meet the requirements. Wellborn realized that it could also benefit from Brushy WSC's excess water. Brushy WSC and Wellborn thus entered into an Interconnection Agreement in February 2003. The agreement called for a twelve inch interconnection line between Wellborn and Brushy WSC ("interconnection line").

Meanwhile, in 2002, the Plaintiff annexed five tracts of land in Wellborn's service area and requested that Wellborn transfer the right to provide water service pursuant to the 1992 contract. The five tracts of land currently have roughly 170 customers. According to Wellborn, the areas within its certificate of convenience and necessity ("CCN") subject to the annexations comprise only six percent of its total service area, or 170 out of a total of 2,717 customers. Wellborn, however, refused to transfer the service area and repudiated the 1992 contract. Wellborn claims that the contract is invalid because it has never been approved by the TCEQ and allegedly conflicts with § 1926(b). The Plaintiff then brought suit in state court to enforce the contract.

In what it alleges was an effort to remove any § 1926(b) barrier in the contract dispute, the Plaintiff tendered an amount to Wellborn and the USDA equal to Wellborn's entire 1926(b) indebtedness, which was estimated to be $507,000. Wellborn declined the offer and the USDA did not object to that decision.

On April 23, 2004, while the contract dispute was pending in state court, Wellborn filed an application for an additional federal loan. Plaintiff alleges that if this loan is consummated, it will

result in imposing additional layers of § 1926(b) protection on Wellborn, extending the protection until 2044, and tripling the cost of removing that protection by paying off the debt.  In its new application, Wellborn seeks $1,034,000 from the USDA through its RUS agency for two projects: (1) the twelve inch interconnection line and (2) changing the existing Wellborn manually read meters with meters that can be read remotely by means of a radio signal.  The interconnection line project could be used to serve the entire Wellborn service area, including the portion of Wellborn that was annexed by the Plaintiff and now within the City of College Station ("City").  Similarly, the water meter project is anticipated to replace all meters in Wellborn, including the approximately 170 meters located within the City.  Although the application does not separate the cost of the two projects, the general manger of Wellborn, Stephen Cast, testified that the bulk of the funds will be used for the water meter replacement project.

On August 19, 2004, the Federal Defendants approved the loan in the full amount of $1,034,000.  The term of the loan is to be 40 years.  Plaintiff challenges the validity of this loan.

## Discussion

### I.    Standards of Review

#### A.    Administrative Procedure Act

The Plaintiff seeks judicial review of an informal agency action under the APA.  The standard of review in an APA case is whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  A decision is arbitrary or capricious "only when it is 'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Gibson v. United States*, 11 Cl. Ct. 6, 15 (1986) (quoting *Motor Vehicle Mfg. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866 (1983)).  The agency decision need only have a rational basis, and it does not have to be a decision

which the court would have made. *Id.* Thus, if the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary or capricious. *Watkins Motor Lines, Inc. v. ICC*, 641 F.2d 1183, 1188 (5th Cir. Unit B Apr. 1981). Indeed, the agency's decision need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record. *Motor Vehicles Mfrs. Assn of the United States, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866-67 (1983). The courts are not empowered to substitute their judgment for that of the agency. *Id.*

With few exceptions, the courts are not permitted to consider evidence outside the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142-43, 93 S. Ct. 1241 (1973); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904-05 (5th Cir. 1983); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S. Ct. 814 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S. Ct. 980 (1977). Generally, agency action is to be upheld, if at all, on the basis of the record before the agency at the time it made its decision. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 51, 103 S. Ct. at 2870-71. However, the Supreme Court has stated that district courts may at times base their review on litigation affidavits even though such affidavits are merely "post hoc" rationalizations, which have traditionally been found to be an inadequate basis for review. *Volpe*, 401 U.S. at 419, 91 S. Ct. 814, 825. In *Volpe*, the Supreme Court noted that a bare administrative record may not disclose the factors that were considered or an agency official's construction of the evidence. 401 U.S. at 420, 91 S. Ct. at 825. It therefore necessary at times for district courts to require some explanation in order to determine if agency officials acted within the scope of their authority. *See id.,* 91 S. Ct. at 825-26. The Supreme Court stated that in cases where there are no formal findings, "it may be that the only way there can be

6

effective judicial review is by examining the decisionmakers themselves." *Id.*  However, the Supreme Court cautioned that "such inquiry into the mental processes of administrative decision makers is usually to be avoided." *Id.,* 91 S. Ct. at 825. (citing *United States v. Morgan*, 313 U.S. 409, 422, 61 S. Ct. 999, 1004-1005 (1941)).

### B.       Preliminary Injunction

A preliminary injunction may be issued to protect the plaintiff from irreparable injury. *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974).  The grant or denial of a preliminary injunction rests in the discretion of the district court. *See Johnson v. Radford*, 449 F.2d 115 (5th Cir. 1971).  The district court, however, does not exercise unbridled discretion.  The court must exercise that discretion in light of "the four prerequisites for the extraordinary relief of preliminary injunction." *Allison v. Froehlke*, 470 F.2d 1123, 1126 (5th Cir. 1972).  The four prerequisites are as follows: (1) a substantial likelihood that plaintiff will prevail on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant; and (4) that granting the preliminary injunction will not disserve the public interest. *Di Giorgio v. Causey*, 488 F.2d 527 (5th Cir. 1973); *Blackshear Residents Organization v. Romney*, 472 F.2d 1197 (5th Cir. 1973).  A preliminary injunction is an "extraordinary remedy" and should only be granted if the plaintiff has "clearly carried the burden of persuasion' on all four requirements." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## II.   Analysis

### A.       Standing

Before addressing whether the Plaintiff is entitled to a preliminary injunction, the Court must first address the issue of standing.  The Federal Defendants argue that Plaintiff cannot succeed on

the merits because it has no prudential standing and has not suffered an injury in fact.  The Court

notes that standing is a threshold inquiry that does not depend upon the merits of the case.  *Izumi v.*

*U.S. Philips Corp.*, 510 U.S. 27, 31, 114 S. Ct. 425, 427 (1993).

### 1.    Injury in Fact/Redressability

Article III of the United States Constitution restricts the "judicial power" of the United States

to the resolution of "cases" and "controversies."  *See Valley Forge Christian College v. Americans*

*United for Separation of Church & State, Inc.*, 454 U.S. 464, 471, 102 S. Ct. 752, 757 (1982).

Encompassed within this restriction is the requirement that "a litigant have 'standing' to challenge

the action sought to be adjudicated in the lawsuit."  *Id.*, 102 S. Ct. at 758.   Standing has

constitutional and prudential components, both of which must be satisfied before a litigant may seek

redress in the federal courts.  *See Warth v. Seldin*, 422 U.S. 490, 499, 95 S. Ct. 2197, 2205 (1975).

The constitutional standing requirement requires:

> (1) that the plaintiff have suffered an "injury in fact"–an invasion of a judicially
> cognizable interest which is (a) concrete and particularized and (b) actual or
> imminent, not conjectural or hypothetical; (2) that there be a causal connection
> between the injury and the conduct complained of–the injury must be fairly traceable
> to the challenged action of the defendant, and not the result of the independent action
> of some third party not before the court; and (3) that it be likely, as opposed to
> merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167, 117 S. Ct. 1154, 1163 (1997).  The party invoking federal

jurisdiction "bears the burden of establishing these elements," and "each element must be supported

in the same way as any other matter on which the plaintiff bears the burden of proof."  *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136 (1992).

The Federal Defendants focus upon the third element, arguing that Plaintiff cannot satisfy

the redressability requirement because,[2] under Texas law, Plaintiff's ultimate ability to provide water service to the annexed areas is contingent on approval by the TCEQ.  Plaintiff argues that the Federal Defendants' argument is without merit because it incorrectly supposes that the Article III redressability requirement means that the judgment must resolve every possible outcome arising from a plaintiff's claims.  The Court agrees, and notes that the United States Supreme Court has rejected the rigid requirement advanced by the Federal Defendants.

In *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 81, 98 S. Ct. 2620, 2634 (1978), the Supreme Court held that the plaintiffs had standing to challenge the constitutionality of the Price-Anderson Act.  The plaintiff alleged a number of injuries, and the Supreme Court noted that it was not necessary to determine whether all the putative injuries were sufficiently concrete to satisfy constitutional requirements.  438 U.S. at 73, 98 S. Ct. 2631.  The Supreme Court used similar reasoning in *Lujan v. Defenders of Wildlife*, when it recognized that persons can assert procedural rights to protect their concrete interests without meeting the normal standards or redressability and immediacy.  504 U.S. at 572 n.7, 112 S. Ct. 2142 n.7 (noting that "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years").

The Court finds that Plaintiff has established all three elements.  The Federal Defendants correctly assert that this Court cannot determine the issue of whether the Plaintiff can become

---

[2] Though the Federal Defendants state that the Plaintiff has not suffered an injury in fact and make that statement under a heading entitled "Injury in Fact," their arguments relate to Article III's "capable of redress" requirement for standing.

Wellborn's water service provider.  Nonetheless, the Plaintiff has suffered a concrete injury because it is has an interest in rural development and is a competitor for water service in Wellborn's CCN. As discussed below, if the USDA funds the loan it could cause immediate and irreparable harm to the Plaintiff.  Finally, the Court can redress this injury if it enjoins the Federal Defendants' from funding the loan.  The Court thus concludes that the Plaintiff has Article III standing to bring the present lawsuit.

### 2.    Prudential Standing

In addition to the Article III standing requirements, federal courts have developed prudential standing considerations "that are part of judicial self-government." *Defenders of Wildlife*, 504 U.S. at 560, 112 S. Ct. at 2136.  In order to have prudential standing under the APA, the grievance the plaintiff seeks to vindicate must fall "*arguably*" within "the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *See Cargill, Inc. v. United States*, 173 F.3d 323, 330 (5th Cir. 1999) (quoting *Bennett*, 520 U.S. at 162, 117 S. Ct. at 1161 (1997)).  A court must first discern the interests arguably to be protected by the statutory provision at issue and then inquire whether the plaintiff's interests affected by the agency action in question are among them. *See Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492, 118 S. Ct. 927, 935 (1998).  The "zone of interest" test is not meant to be especially demanding; in particular, "there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399, 107 S. Ct. 750, 757 (1987).  However, in cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.  *Id.*

The Federal Defendants make two interrelated arguments.  First, they contend that the Plaintiff's interests in annexation, providing municipal water services, and increasing its tax base, are not within the "zone of interest" of 7 U.S.C. § 1926.  Second, the Federal Defendants argue that, as a municipal corporation seeking to annex and take away Wellborn's water service areas, Plaintiff's interests are squarely at odds with the purpose, intent, and interests of § 1926.  The Federal Defendants make the first assertion in passing without providing any specific argumentation in support thereof.  The Court assumes the Federal Defendants support both contentions with the same argument and will therefore address both arguments together.  For the reasons discussed below, the Court disagrees with the Federal Defendants' arguments.

The Federal Defendants rely upon the two principal purposes behind § 1926(b) reflected in the legislative history: (1) "to encourage rural water development by expanding the number of potential users of such systems, thereby decreasing the per-user cost," and (2) "to safeguard the viability and financial security of such associations (and [the Federal Defendants'] loans) by protecting them from the expansion of nearby cities and towns."   *City of Madison, Miss. v. Bear Creek Water Ass'n, Inc.*, 816 F.2d 1057, 1060 (5th Cir. 1987).  These "purposes," however, do not reflect the only interests that the statute seeks to protect.  The interplay between the principal purposes the Fifth Circuit noted in *City of Madison* and other interests implicated by § 1926 is reflected in the very passages quoted by the Federal Defendants:

> To allow expanding municipalities to "skim the cream" by annexing and condemning those parts of a water association with the highest population density (and thus the lowest per-user cost) would undermine Congress's purpose of facilitating inexpensive water supplies for farmers and other rural residents and protecting those associations' ability to repay their FmHA debts.
> . . .
> [It] is likely that FmHA's subsidy to the rural water authority enhanced real estate values and farm prosperity in and around the city and has provided an indirect benefit to the city's overall economic conditions in exchange for the limits on its water service authority. *The overall effect of [7 U.S.C. § 1926(b)] is therefore not*

> *so much to infringe the city's sovereign power as to foster a cooperative effort*
> *between local and federal authorities.* The Tenth Amendment is surely not offended
> by a limited restriction imposed by the federal government to protect its subsidized
> loans, particularly when the benefits of those loans accrue to the municipality.

*City of Madison*, 816 F.2d at 1060, 1061(citations omitted, emphasis added).[3]  As indicated by the

italicized language in the second paragraph, the Fifth Circuit has recognized that § 1926(b)

contemplates that cities surrounding rural water associations have an interest in rural water

development.  The Plaintiff's interest in future growth is not merely marginally related to or

inconsistent with the purposes of § 1926(b).

The Federal Defendants' own regulations also recognize that local agencies, such as

municipalities surrounding rural water associations, have an interest in rural development.  Under

the regulations' "General Policies and Requirements," 7 C.F.R. § 1780.1(a) states that the RUS:

> shall cooperate fully with State and local agencies in making loans and grants to
> assure maximum support to the State strategy for rural development.  Agency
> officials and their staffs shall maintain coordination and liaison with State agency
> and substate planning districts.

The interest of local agencies is also reflected in the requirement that facilities financed under the

regulations be consistent with current development plans of the municipalities in which the proposed

project is located.  *See* 7 C.F.R. § 1780.1(h).

Finally, the Plaintiff has an interest in ensuring that the regulations were followed properly

because, based upon its annexations, it is a competitor of Wellborn.  *Cf. Melissa Indus. Dev. Corp.*

*v. North Collin Water Supply Corp.*, 256 F. Supp. 2d 557, 567 (E.D. Tex. 2003) (holding that

plaintiffs are competitors for water services of water supply corporation, an entity regulated by

§ 1926 and therefore have an interest in the propriety of government's approval of a loan).

---

[3] The FmHA is an acronym for the Farmers Home Administration, which was the
predecessor to the RUS.

Numerous courts have held that competitors of regulated entities have standing to challenge and enforce applicable regulations. *See, e.g., Nat'l Credit Union Admin.*, 522 U.S. at 495, 118 S. Ct. at 936 ("As competitors of national banks, travel agents and data processors had [an arguable] interest, and that interest had been affected by the Comptroller's interpretations opening their markets to national banks."); *Sault Ste. Marie Tribe of Chippewa Indians v. United States*, 288 F.3d 910, 914 (6th Cir. 2002) ("the 'zone of interests' concept is sufficiently broad to embrace the interests of an actual or potential competitor."); *UPS Worldwide Forwarding, Inc. v. United States Postal Serv.*, 66 F.3d 621, 630 (3d Cir. 1995) (noting that the Supreme Court has recognized that competitors fall within the zone of interests of the postal monopoly statutes). As a competitor of Wellborn, Plaintiff has a clear interest in ensuring that its competitor has "the proper authority to apply for a loan/grant that essentially shuts [the Plaintiff] out of the water market for four decades." *Melissa Indus.*, 256 F. Supp. 2d at 565.

In sum, in light of the policies and interests recognized by the statute and the Federal Defendants through their regulations, the loan approved by the Federal Defendants implicates the Plaintiff's interest in excess of the "arguable" standard required by the Supreme Court. *See Cargill*, 173 F.3d at 330 (quoting *Bennett*, 520 U.S. at 162). The Plaintiff has an interest in fostering the kind of cooperative effort between local and federal authorities that the Fifth Circuit recognized § 1926 seeks to promote. *See City of Madison*, 816 F.2d at 1061. Additionally, the Plaintiff is a competitor for water service with Wellborn. As such, the Plaintiff has an interest in the propriety of the loan approved by the Federal Defendants. For these reasons, the Plaintiff has prudential standing to raise its claims under the APA.

### B.   Substantial Likelihood that Plaintiff Will Prevail on the Merits

Plaintiff urges the Court to issue a writ of mandamus and/or a permanent injunction against

the Defendants.  Plaintiff also urges the Court to declare that the Federal Defendants' approval of a $1,034,000 loan to Wellborn is invalid due to violations of their own regulations.  The loan at issue is governed by part 1780 of the Code of Federal Regulations.  Those regulations have the force of law and are binding upon the Federal Defendants.  *See United States v. Nixon*, 418 U.S. 683, 695-96, 94 S. Ct. 3090, 3101-02 (1974).  Plaintiff alleges that the loan violates part 1780 in the following five ways:

(1)     The proposed loan violates the requirement of 7 C.F.R. § 1780.7(d) that loans are not available to borrowers who can obtain commercial credit;

(2)     The loan approved by the Federal Defendants is for a longer term than is permitted by 7 C.F.R. § 1780.13(e);

(3)     The loan includes funds for facilities in non-rural areas, even though 7 C.F.R. § 1780.7(b) limits eligible facilities to those serving rural areas;

(4)     The proposed loan does not meet the requirement that it be consistent with municipal development plans; and

(5)     The proposed loan does not comply with the requirements for public notice and participation of 7 C.F.R. § 1780.19(b).

The Court will address each in turn.[4]

---

[4] Wellborn presents a number of legal arguments in its counter to the Plaintiff's five arguments on the merits.  By contrast, the Federal Defendants simply state that the determination to approve the loan was not arbitrary, capricious, an abuse of discretion, or unlawful and quote from the affidavit of Francisco Valentin, Jr. ("Valentin"), the Community Program Director for Rural Development at the USDA in support thereof.  *See* Federal Defendants' Preliminary Injunction Brief (Dkt. #15), Exhibit 2, Affidavit of Francisco Valentin, Jr.  Valentin's affidavit is technically evidence outside the administrative record.  *See Camp v. Pitts*, 411 U.S. 138, 142-43, 93 S. Ct. 1241 (1973); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904-05 (5th Cir. 1983).  However, the Supreme Court has noted that in cases where, as here, there are no formal findings, "it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S. Ct. 814, 825-26 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S. Ct. 980 (1977).  Accordingly, the Court will give weight to Valentin's affidavit but will not consider assertions that it deems to be purely post hoc rationalizations with no support in the record.  Such assertions do not provide an adequate basis for review.

1.     **The Proposed Loan Violates the Requirement of 7 C.F.R. § 1780.7(d) That Loans Are Not Available to Borrowers Who Can Obtain Commercial Credit**

Prior to loan approval, the Federal Defendants' regulations require applicants to certify in writing and the agency to determine and document that "the applicant is unable to finance the proposed project from their own resources or through commercial credit at reasonable rates and terms." 7 C.F.R. § 1780.7(d). The Plaintiff argues that Wellborn's inability to obtain a commercial loan with similar terms has nothing to do with its financial need. It also argues that Wellborn has a strong balance sheet and income statement and is a creditworthy entity. According to Plaintiff, no lender would issue a 40-year note to purchase an asset with perhaps a ten-year useful life (i.e., the electronically read water meters). It argues that Wellborn and the Federal Defendants made their certifications of unavailability on the basis of an unauthorized and realistically impossible benchmark. In response, Wellborn argues that the Plaintiff is attempting to substitute its opinion for the Federal Defendants' opinion as to what it considers "commercial credit at reasonable rates and terms." It argues that the Federal Defendants determined and documented that the project Wellborn submitted was eligible for § 1780.7 financing.

At the time Wellborn applied for the loan, it submitted its most recent audited financial statement as well as a letter from its president certifying that Wellborn

> has not been able to obtain financing of a $1,034,000 loan through a public institution that would be able to meet either the interest rate of 4.375% or the term of 40 years which Rural Development offers.

Based upon its review of all the information submitted, the Federal Defendants determined and documented that the project Wellborn submitted was eligible for financing pursuant to § 1780.7. That determination does not appear arbitrary or capricious or a violation of § 1780.7.

Plaintiff also argues that if one of the purposes of the statute is to make water-infrastructure

loans available to water associations that cannot obtain commercial credit elsewhere, *Melissa Indus.*, 256 F. Supp.2d at 566-67, then the only reasonable reading of the regulation is that it is the credit-worthiness of the applicant, not the unmatchable terms offered by the Federal Defendants, that determines whether the applicant can obtain alternative financing elsewhere "at reasonable rates and terms." 7 C.F.R. § 1780.7(d). It asserts that the Defendants' interpretation turns one of the purposes of the regulation on its head by requiring the applicant only to establish that there was no other financing available at the *same* rates and terms offered by the Federal Defendants, regardless of whether those terms are reasonable.

Valentin's affidavit states that Wellborn's unrestricted funds are less than one year's operating expenses. Valentin also states that the agency's policy perspective is that in such situations the applicant has insufficient funds from which to finance proposed facilities and maintain its reserves. This statement does not appear to be a purely post hoc rationalization or an explanation made in response to a specific argument made by the Plaintiff. This explanation thus provides an adequate basis to review the determination under § 1780.7(d). *See Volpe*, 401 U.S. at 419, 91 S. Ct. at 825. The Court is satisfied by the explanation and does not find the determination to be arbitrary, capricious, an abuse of discretion, or unlawful under 5 U.S.C. § 706. Accordingly, it is unlikely that the Plaintiff will be able to prevail on the merits of this argument.

2.      **The Loan Approved by the Federal Defendants Is for a Longer Term Than Is Permitted By 7 C.F.R. § 1780.13(e)**

Plaintiff points to the Federal Defendants' rule, which provides that "[t]he loan repayment period shall not exceed the useful life of the *facility*, State statute or 40 years from the date of the note or bond, whichever is less." 7 C.F.R. § 1780.13(e) (emphasis added). Plaintiff notes that the term of the challenged loan is for 40 years, and contends that the regulation will be violated because the majority of the loan proceeds will be used to purchase electronically read water meters that have

useful lives far less than the 40-year term of the loan.  The parties agree that Plaintiff's argument depends upon the definition of "facility."

The term "facility" is not defined in the regulations.  Plaintiff and the Defendants propose different meanings for that term.  The Fifth Circuit has noted that undefined terms must be interpreted "according to their ordinary and natural meaning and the overall policies and objectives of the statute."  *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004) (quoting *Salinas v. United States*, 522 U.S. 52, 57, 118 S. Ct. 469, 473 (1997)) (citation and internal quotation marks omitted).

The Plaintiff's argument is correct so long as the term "facility" in § 1780.13(e) means either the larger system that the USDA's loan proceeds will be used to acquire, or the part of the system that the majority of the loan proceeds will be used to acquire.  Plaintiff's proposed definition is guided by the principles embedded in part 1780.  Wellborn argues that the term should rather be construed to have a broader meaning, one which focuses on the entire system and takes into account the useful lives of all the component parts of the system.  Essentially, Wellborn argues that because one component of the project (i.e., the interconnection line) will have a useful life of at least 40 years, the loan repayment period will not exceed the useful life of the proposed facility.

Wellborn contends that the term cannot mean the broader, larger "system" that the loan proceeds are used to purchase or construct because the code already contains the term "project," which has a definition close to the definition that Plaintiff proposes for the term "facility."  Section 1780.3 defines the term "project" as follows:

> Project means all activity that an applicant is currently undertaking to be financed
> in whole or part with RUS assistance.

Wellborn also argues that the terms "facility" and "project" cannot share the same meaning because the two terms appear in the same sentence throughout the code.  For instance, it points to § 1780.35(c), which provides in part:

17

> The user charges should be reasonable and produce enough revenue to provide for all costs of the *facility* after the *project* is complete.

7 C.F.R. § 1780.35(c) (emphasis added).  Wellborn also refers to § 1780.57(a):

> *Facility* planning and design must not only be responsive to the owner's needs but must consider the environmental consequences of the proposed *project*.

7 C.F.R. § 1780.57(a) (emphasis added).  According to Wellborn, the two terms would not be used in this manner if they were intended to have the same meanings.

Despite the logic of Wellborn's argument, the Court does not believe the term "facility" was intended to have one consistent definition throughout part 1780.  Rather, the Court agrees with the Plaintiff that the term "facility" appears to be a "convenient general term" with a meaning that varies with context.  Section 1780.9 is instructive.  Subsection 1780.9(e) refers to "facilities authorized in paragraphs (a), (b), (c) or (d) of this section."  7 C.F.R. § 1780.9(e).  Subsection 1780.9(a) speaks broadly in terms of larger systems.  For instance, it refers to rural water, sanitary sewage, solid waste disposal, and storm wastewater disposal facilities.  On the other hand, subsections (b) and (c) refer to buildings, roads, bridges, fences, and other improvements.  Thus, the broad language contained in subsection (a) would be consistent with the Plaintiff's proposed definition that "facility" means the larger water supply system.  Yet, subsections (b) and (c) suggest that "facility" can also refer to the component parts of a larger system.  In light of these inconsistencies and the fact that the term "facility" is not defined in the regulation, the Court will not attempt to create a single meaning for the term "facility."  The Court will define the term within the context of § 1780.13(e) and the dual purposes behind § 1926(b).  *Cf. Kay*, 359 F.3d at 742.

The legislative history of § 1926(b) provides the following language:

> By interpretation, loans cannot now be made unless a major part of the use of the facility is to be by farmers. This section would broaden the utility of this authority somewhat by authorizing loans to associations serving farmers, ranchers, farm tenants, and other rural residents. This provision authorizes the very effective

> program of financing the installation and development of domestic water supplies and pipelines serving farmers and others in rural communities. *By including service to other rural residents, the cost per user is decreased and the loans are more secure in addition to the community benefits of a safe and adequate supply of running household water. A new provision has been added to assist in protecting the territory served by such an association against competitive facilities, which might otherwise be developed with the expansion of municipal and other public bodies into an area served by the rural system.*

S. REP. NO. 566, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.C.C.A.N. 2243, 2309 (emphasis added); *see also City of Madison*, 816 F.2d at 1059-60.  The legislative history indicates that there are two principal purposes behind § 1926(b): (1) to encourage rural water development by expanding the number of potential users of such systems, thereby decreasing the per-user cost, and (2) to safeguard the viability and financial security of such associations (and the Federal Defendants' loans) by protecting them from the expansion of nearby cities and towns.  *City of Madison*, 816 F.2d at 1060.

The purpose of § 1780.13(e) is to ensure that a "facility" receiving financing from the government will continue in operation during the entire term of the loan.  Section 1780.7 outlines the eligibility requirements for USDA-RUS loan applicants.  Subsection 1780.7(f) states in pertinent part:

> Economic feasibility.  All projects financed under the provisions of this section must be based on taxes, assessments, income, fees, or other satisfactory sources of revenues in an amount sufficient to provide for facility operation and maintenance, reasonable reserves, and debt payment.

This language indicates that all projects must be economically feasible in that the project financed must be able to support repayment of the Federal Defendants' loan.  This is simply an implementation of one of the dual congressional purposes of § 1926(b) "to safeguard the viability and financial security of such associations (and [the Federal Defendants'] loans)."  *See* 816 F.2d at 1060.

19

Wellborn argues that the regulations assume that a "facility" may have assets with useful lives far less than the 40-year term of the loan (i.e., such as the electronically read water meters). Wellborn refers the Court to § 1780.35(c), which states in pertinent part:

> The planned revenue should be sufficient to provide for all debt service, debt reserve, operation and maintenance, and, if appropriate, additional revenue *for facility replacement of short-lived assets without building a substantial surplus.*

7 C.F.R. § 1780.35(c) (emphasis added). The regulations, however, do not state that the *majority* of the loan proceeds may be used to purchase assets with useful lives less than the 40-year term of the loan. Such a loan, like the loan challenged here, would not be economically prudent. In this case, there may be insufficient collateral to secure the challenged loan because over 50 percent of it will be used to purchase electronically read meters with useful lives far less than the 40-year term of the loan.[5]

Similarly, Federal Defendants cite the affidavit of Francisco Valentin, Jr. ("Valentin"), the Community Program Director for Rural Development at the USDA. Valentin alleges that in approving the loan, he determined that:

> The repayment period of any RUS loan may not exceed the useful life of the facility. However, the "facility" is not individual components of the system, such as water meters. There are many parts of a utility facility which wear out or are obsoleted or consumed before the end of the 40-year repayment period of the RUS loan. The "facility" which must have a useful life which is at least equal to the repayment period of the RUS loan is the utility system of the applicant/borrower which is pledged (or the revenue from which is pledged) as security for the RUS loan. In this respect, I have determined that the water utility facility of Wellborn SUD has a

---

[5] At the preliminary injunction hearing, the general manager of Wellborn testified that over 50 percent of the loan proceeds will be used to fund the water meter replacement project. Though this evidence is outside the administrative record, the Court may require some explanation in order to determine if agency officials acted within the scope of their authority. *See Volpe*, 401 U.S. at 420, 91 S. Ct. at 825.

useful life of at least 40 years.[6]

The Court understands Valentin's reference to the facility as the "utility system" to refer to the interconnection line and his reference to "component parts" to refer to the water meters.  The Court finds this affidavit testimony to be purely a post hoc rationalization rather than an explanation of the factors Valentin considered in making his determination to fund Wellborn's loan.  *See Volpe*, 401 U.S. at 419, 420, 91 S. Ct. at 825.  The record contains a document entitled "Project Information" in which Valentin refers to the component parts of the system (i.e., the meters) as an "Existing Facility."[7]  This directly conflicts with Valentin's assertion in the affidavit that a "facility" is not the individual components of a system.  Valentin also states that agency borrowers who obtained loans in the 1960s for construction of facilities similar to Wellborn's are still operating those facilities in a commercially feasible manner.  The Court also views this assertion as an unreliable post hoc rationalization.  The statement is simply a response to the argument Plaintiff makes in its preliminary injunction brief that the regulations require the loans to make economic sense.  For these reasons, the Court finds Valentin's affidavit testimony on the definition of "facility" to be an inadequate basis for review.[8]  *See Volpe*, 401 U.S. at 419, 91 S. Ct. at 825.

In light of the concerns recognized by § 1926(b) and § 1780.13(e) of the regulations, the Court is of the opinion that the term "facility" in § 1780.13(e) means the larger system that the

---

[6] Federal Defendants' Preliminary Injunction Brief (Dkt. #15), Exhibit 2, Affidavit of Francisco Valentin, Jr., para. 7.

[7] Federal Defendants' Preliminary Injunction Brief (Dkt. # 15) Exhibit I, Administrative Record, Project Information, AR 000161.

[8] Valentin also asserts that the water meter improvement portion of the loan is a "project" and not a "facility."  Even assuming this statement were not simply a post hoc rationalization, the Court finds it to be unpersuasive.  Even if Wellborn's effort to replace its current water meters is a "project, the physical water meters themselves are a part of the larger "facility" that Wellborn proposes to build.

USDA's loan proceeds will be used to acquire, or the part of the system that the majority of the loan proceeds will be used to acquire.  Based on the record and the explanations given at the preliminary injunction hearing, the majority of the loan proceeds are intended to be used to purchase water meters that have a useful life much shorter than the term of the loan.  For these reasons, the Court is of the opinion that the Federal Defendants' decision was "not in accordance with law."  5 U.S.C. § 706.  Accordingly, it is likely that Plaintiff will prevail on the merits of this argument.

### 3. The Loan Includes Funds for Facilities in Non-rural Areas, Even Though 7 C.F.R. § 1780.7(b) Limits Eligible Facilities to Those Serving Rural Areas

The Plaintiff essentially argues that the land it has annexed has been transformed from rural to urban by nature of the annexation.  It points to the Federal Defendants' regulation which states "loan and grant funds may be used to finance only that portion of the facility serving rural areas, regardless of the facility location."  7 C.F.R. § 1780.7(b).[9]  According to the Plaintiff, because the annexed areas are urban, the loans will be used unlawfully to build a portion of the facility that serves urban areas in violation of the Federal Defendants' rules.

Under § 1780.3, the term "rural and rural areas" means "any areas not in a city or town with a population in excess of 10,000 inhabitants, according to the latest decennial census of the United States."  7 C.F.R. § 1780.3.  Thus, § 1780.3 contains two requirements: (1) that the area not be in a city or town and (2) that the population not be in excess of 10,000 inhabitants according to the latest decennial census.  According to the most recent census in 2000, there are estimated to be 7,065

_____

[9] The full text of § 1780.7(b) states the following:

(b) Eligible facilities. Facilities financed by RUS may be located in non-rural areas. However, loan and grant funds may be used to finance only that portion of the facility serving rural areas, regardless of facility location.

inhabitants living within the Wellborn service area.  Plaintiff argues that even if the challenged loan meets the 10,000 maximum population requirement, it cannot satisfy the second requirement because the annexed areas are not "areas not in a city or town."  The Plaintiff contends that, rather, the annexed areas are now part of the City.  According to the Plaintiff, the amount of people in Wellborn according to the 2000 census is of no import because the area annexed is part of the City. The Court agrees.

Wellborn argues that Plaintiff's argument cannot be correct because it would mean the Plaintiff's act of annexing portions of Wellborn would supersede the method prescribed in § 1780.7 by the Federal Defendants for determining whether an area is rural.  However, Wellborn overlooks the fact that included in that very method is a requirement that grant funds only be used to serve areas that are not in a city or town. Because the Plaintiff annexed land within Wellborn, those annexed areas are part of a city or town.

Wellborn also asserts that the Plaintiff's argument has no merit due to the definition of the term "facility" in part 1780.  This argument is unconvincing.  For purposes of its argument under § 1780.7, Plaintiff does not purport to define the term "facility."  However, regardless of whether "facility" is defined as the larger system that the USDA's loan proceeds will be used to purchase or construct or as the entire system including its component parts, the text of § 1780.7(b) states "loan and grant funds may be used to finance only that *portion* of the facility serving rural areas" (emphasis added).  Even if a "facility" is defined by its component parts, the only part of the "facility" satisfying § 1780.7(b) are the meters serving homes that are not part of the City.  Because the interconnection line and the remaining meters are intended to serve the areas annexed by the Plaintiff, it appears that the loan proceeds used to construct those portions of the project would be

granted in violation of the regulations.[10]

Citing Valentin's affidavit, the Federal Defendants apparently argue that the annexed areas are rural in nature and that the loan funds will only be used to finance a facility that serves rural areas. Valentin's affidavit states:

> I . . . have determined that the area served by Wellborn SUD is rural in nature . . .
> The number of users within the Wellborn SUD service area, while not determinative
> of whether the area is rural, is less than 10,000 population. A small portion of the
> area served by Wellborn SUD was annexed by the City of College Station after the
> 2000 census. *College Station has a population in excess of 10,000. However, the
> annexed areas are rural in nature, are not segregable portions of the water utility
> system of Wellborn SUD, and contain water utility improvements upon which RUS
> maintains a lien to collateralize loans made by it or its predecessor agency FmHA.*
> Additionally, the revenue from these newly annexed areas are pledged to RUS as
> collateral for the RUS loans. It is the policy of RUS to provide funding to preserve
> and improve facilities which serve as collateral for RUS loans or from which revenue
> is generated which is pledged to RUS as collateral for RUS loans, even though a
> portion of such facilities maybe [sic] located in areas annexed by municipalities with
> populations in excess of 10,000. Thus, it is consistent with agency policies and
> procedures to finance improvements which will serve and benefit the entire Wellborn
> SUD water utility system even though a small part of the system has recently been
> annexed by the City of College Station.[11]

Even assuming this determination and explanation is reliable and not merely a response to the arguments in Plaintiff's preliminary injunction brief, the Court does not find the Federal Defendants' determination to be in accordance with law.

The Court can discern three potential arguments raised by the Federal Defendants through Valentin's affidavit. First, Federal Defendants seem to argue that the annexed areas are rural areas because they are "rural in nature." Section 1780.3 provides the definition of "rural and rural areas."

---

[10] Though the administrative record does not appear to explicitly state that the two proposed projects will serve the annexed areas, it implicitly indicates that the projects will be used to serve the entire Wellborn service area. This would include the areas annexed by the Plaintiff.

[11] Federal Defendants' Preliminary Injunction Brief (Dkt. #15), Exhibit 2, Affidavit of Francisco Valentin, Jr., para. 6 (emphasis added).

That definition does not contain any exceptions for an agency official's determination that an area is "rural in nature."  Second, Federal Defendants argue that the annexed areas are rural because they are not segregable from Wellborn which is a rural area itself.  This argument is unconvincing.  The areas annexed by the Plaintiff are by definition segregable portions of the larger water utility system. Those areas were annexed by the Plaintiff and are now part of the City; they are no longer part of Wellborn.

Finally, the Federal Defendants appear to argue that the annexed areas are rural because they contain improvements upon which RUS maintains a lien to collateralize its loans.  This argument is also without merit.  The definition of "rural and rural areas" is not ambiguous and the Court need not look to the statute's underlying policies to reach the conclusion that the annexed areas are not rural under § 1780.7(b).  *See City of Madison*, 816 F.2d at 1059 (holding that the court need not resort to legislative history where the statutory language is unambiguous and yields no absurd results) (citing *Steere Tank Lines, Inc. v. I.C.C.*, 724 F.2d 472, 477 (5th Cir. 1984)).  The definition of rural areas does not contain a qualifier that allows the Federal Defendants to designate areas as rural so long as the areas contain utility improvements upon which RUS maintains a lien to collateralize its loans.  It is not proper for the Court to modify the definition of "rural areas" to account for the Federal Defendants' interest in collateral.[12]

The Court concludes that, because the annexed areas are not rural under § 1780.7(b), the

---

[12] The Court notes that other parts of the regulatory scheme adequately address the concerns raised by the Federal Defndants.  *See* 7 C.F.R. §§ 1951.226 & 1951.232.  For instance, under 7 C.F.R. § 1951.226, the USDA must approve any "cash sale of all or a portion of a borrower's assets or an exchange of security property."  In approving any such transfer, a USDA administrator must makes certain determinations, including: "(1) [t]he consideration is adequate; (2)[t]he release will not prevent carrying out the purpose of the loan; [and] (3) [t]he remaining property is adequate security for the loan or the transaction will not adversely affect FmHA or its successor agency under Public Law 103-354's security position." 7 C.F.R. § 1951.226(b)(1)-(3).

Plaintiff is likely to succeed on its argument that the Federal Defendants improperly approved loan proceeds used to construct the interconnection line and those meters that are intended to serve the areas annexed by the Plaintiff.

### 4.   The Proposed Loan Does Not Meet the Requirement That it Be Consistent with Municipal Development Plans

The Plaintiff also argues that the proposed loan interferes with the development plan it created when it annexed areas in Wellborn.  The Plaintiff's plan called for it to be phased in as the service provider in the areas it annexed.  Plaintiff contends that this plan was entirely consistent with Wellborn's contractual promise to transfer the right to provide water service to those areas once the City annexed them.  It also argues that it annexed the land and adopted the plan prior to Wellborn's recent application for USDA funds.

In response, Wellborn and the Federal Defendants assert that Brazos Valley Council of Governments ("Council of Governments"), the State designated regional council, reported its review of the proposed Wellborn project as "favorable."  The Federal Defendants cite the following passage from Valentin's affidavit:

> RUS Instruction 1780.1.(h) does not require that USDA financed facilities be consistent with the desire of College Station to serve the areas annexed.  This regulation indicates to agency personnel that the intergovernmental review process is applicable to RUS loans and grants.  The regulations which govern the intergovernmental review process are in 7 C.F.R. part 3015 Subpart V, which is an attachment to an unpublished agency regulation.  This regulation implements Executive Orders 12372 and 12416.  Pursuant to this regulation, the applicant is required to provide the appropriate multi-jurisdictional regional clearinghouse with information concerning the proposed project and request comments.  In Texas, the local multi-jurisdictional council of governments functions as the regional clearinghouse in the intergovernmental review process.  In this case, the Brazos Valley Council of Governments furnished favorable comments.  Since favorable comments were received from Brazos Valley Council of Governments, the $1,034,000 RUS loan can proceed as being consistent with applicable development

plans.[13]

Even assuming Valentin's explanation provided an adequate basis to review the Federal Defendants'

decision to fund the loan to Wellborn, the Court is not satisfied by the explanation.  Section 2 of

Executive Order 12372 mandates that, to the extent that the States "develop their own processes or

refine existing processes for State and local elected officials to review and coordinate proposed

Federal financial assistance and direct Federal development, the Federal agencies shall" consult with

state and local elected officials and make efforts to accommodate their concerns.[14]  Exec. Order No.

12372, 3 C.F.R. 197, 42 Fed. Reg. 30,959 (July 14, 1982).  Section 3(a) states that "[t]he State

process referred to in Section 2 shall include those where States delegate, in specific instances, to

local elected officials the review, coordination, and communication with Federal agencies."  *Id.*

Even if the Council of Governments gave the proposed loan favorable comments, the

§ 1926(b) protection resulting from the loan would clearly interfere with the Plaintiff's development

plan.  The regulation requires unambiguously that "RUS financed facilities will be consistent with

any current development plans of State, multijurisdictional areas, counties, or municipalities in

which the proposed project is located." 7 C.F.R. § 1780.1(h).  Moreover, the injuries claimed by the

Plaintiff implicate the very concerns that Executive Order 12372 sought to address.  Though the

Plaintiff is not a member of the Council of Governments, part of the project is located within the

Plaintiff's city limits.  The Federal Defendants evidently did nothing to consult with the Plaintiff's

elected officials to accommodate or address their concerns.

Wellborn presents a number of additional arguments in support of its claim that the Federal

---

[13] Federal Defendants' Preliminary Injunction Brief (Dkt. #15), Exhibit 2, Affidavit of Francisco Valentin, Jr., para. 10.

[14] Executive Order No. 12416 makes minor amendments to Executive Order No. 12372. The Court will not address Executive Order No. 12416 in any detail.

Defendants' decision to approve the loan was in compliance with § 1780.1(h). Wellborn argues that the Plaintiff is precluded, and was precluded at the time of adoption of its service plan, from providing water service to the subject areas due to Wellborn's *existing* federal debt (i.e., apparently, the existing § 1926(b) protection) and state law. The Court disagrees. At the time the Plaintiff annexed portions of Wellborn it did so with the understanding that the existing 1926(b) protection would be waived by Wellborn. Additionally, the parties had an agreement under state law, TEX. WATER CODE ANN. § 13.255(a), that would have allowed the Plaintiff to take over Wellborn's CCN. While, the Plaintiff could not have been assured that the USDA would approve the transfer of service rights, the Texas Local Government Code requires that municipalities proposing an annexation complete a service plan providing for "the extension of full municipal services to the areas to be annexed." TEX. LOC. GOV'T CODE ANN. § 43.056(a). Thus, the Plaintiff was required to, rather than precluded from, adopting a service plan. This is true even if there was no guarantee that the USDA would approve the transfer of the right to provide water service.

Additionally, Wellborn maintains that consistency with development plans under § 1780.1(h) cannot be trumped by a local entity's self-serving, unilateral designation of itself as the preferred service provider. The Court does not believe the Plaintiff made any such unilateral designation. Such a designation can only be made by the TCEQ. Further, the Court is not persuaded that Wellborn acted in a self-serving manner when Wellborn is the entity that wants to repudiate its contract after the Plaintiff already annexed some of its territory. The Plaintiff was required to create a development plan and the federal regulations require that RUS financed facilities be consistent with any such development plans.

Finally, Wellborn argues that the Plaintiff did not apply to the TCEQ to obtain the right to provide water service in the competing utility's CCN and currently has no state approval to provide service in the annexed areas. Wellborn argues that it holds the retail water CCN and has the sole

and exclusive right to provide water service.  Wellborn, however, overlooks the existence of the disputed contract between it and the Plaintiff.  TEX. WATER CODE ANN. § 13.255 provides two means by which a municipality can obtain the right to provide water service to a rural areas: (1) subsections 13.255(b)-(l) and (2) subsection 13.255(a).  Only one of the methods, subsections 13.255(b)-(l) requires an application.  Subsection 13.255(a) provides that if the current provider and the annexing city have an agreement in writing as to who is to provide service to a newly annexed area, they are to file the agreement and the TCEQ "shall incorporate the terms of the agreement into the respective certificates of convenience and necessity of the parties to the agreement."  Thus, Wellborn's argument that Plaintiff never applied to the TCEQ does not mandate a finding the Federal Defendants complied with § 1780.1(h).

The Court finds that the proposed project interferes with the Plaintiff's development plan because it will threaten the Plaintiff's ability to grow and expand.  Accordingly, the Plaintiff is likely to succeed on the merits of its argument that the Federal Defendants failed to comply with the requirements of 7 C.F.R. § 1780.1(h).

### 5.    The Proposed Loan Does Not Comply with the Requirements for Public Notice and Participation of 7 C.F.R. § 1780.19(b)

The Federal Defendants' regulations require public participation in the loan approval process.  Specifically, 7 C.F.R. § 1780.19(b) provides that loan applicants "must hold at least one public information meeting."  Section 1780.19(b) also states that "[t]he public meeting must be held not later than loan or grant approval."  Plaintiff argues that the loan is impermissible because a required public meeting was held after the Federal Defendants' approved the loan.  It argues that, while the loan was approved on August 6, 2004, the public information meeting required by § 1780.19(b) was not held until September 21, 2004—more than a month after the loan was approved.

Wellborn argues that the USDA properly exercised its administrative discretion to allow the public meeting to be held after the loan approval date. *See* 7 C.F.R. § 1780.25. The Federal Defendants' regulations authorize it to make exceptions such as this so long as the exceptions are not inconsistent with the statute and are in the government's interest.

Plaintiff contends that the USDA itself never claimed to make an exception to its regulations. It argues that the fact that the USDA does not claim it was making an exception refutes Wellborn's position that the USDA in fact exercised its exception authority. Additionally, Plaintiff argues that if the USDA is to assert that it is making an exception to its regulations, it is required to make that determination before it acts and not as an after-the-fact justification.

The Federal Defendants refer to the USDA's exception authority in its preliminary injunction brief and its Reply to Plaintiff's Preliminary Injunction Briefs (Dkt. #18). The Court understands these references to consist of an argument that the USDA did in fact exercise its exception authority. Despite this assertion, there is nothing in the administrative record indicating that the Administrator actually exercised its exception authority. It appears that the Administrator simply neglected to follow the rule and attempted to justify its actions retroactively.

According to Wellborn, though the meeting took place subsequent to the loan approval, there was a letter of conditions stating that the meeting had to take place before the loan could be funded. Defendants also argue that the fact that the loan was approved prior to the meeting is harmless because there was no input at the public information meeting anyway. The Plaintiff contends that a hearing held after the loan has already been approved frustrates the purpose of having a hearing. The Court agrees. While people may attend a hearing after a loan has already been approved, the level of attendance and participation is likely to be reduced due to the fact of the prior approval. Given the harm to College Station pursuant to the § 1926(b) protection that would follow from the loan being funded, the Court is of the opinion that the Plaintiff was entitled to demand a hearing that

would be administered in such a way as to not diminish public attendance and participation.  Thus, the Court believes that the Federal Defendants did not observe a procedure required by law.  5 U.S.C. § 706(2)(D).  Accordingly, it is likely that the Plaintiff will prevail on the merits of its argument that the Federal Defendants failed to comply with § 1780.19(b).

### III.    Threat that Plaintiff will Suffer Irreparable Injury if the Injunction is Not Granted

The Plaintiff argues that the practical effect of § 1926(b) is to prevent it from providing water service to areas within the Wellborn service area for the life of the loan.  The Court disagrees with this as a broad assertion.  It finds, however, that the Plaintiff will suffer irreparable harm if Wellborn receives additional § 1926(b) protection because there is no guarantee that the USDA will consent to an action by the TCEQ granting the Plaintiff a CCN.

The Texas Water Code provides two methods by which a municipality can obtain single certification in incorporated or annexed areas.  *See* TEX. WATER CODE ANN. § 13.255.  The first method is reflected in § 13.255(a).  That section provides that, if the current provider and the annexing city have an agreement in writing as to who is to provide service to a newly annexed area, they are to file the agreement and the TCEQ "shall incorporate the terms of the agreement into the respective certificates of convenience and necessity of the parties to the agreement."  The second method is reflected in § 13.255(b)-(l), which provide that when a city annexes areas served by a special utility district such as Wellborn, the city may file an application to serve the annexed area, and the TCEQ "shall grant single certification to the municipality" if certain criteria are satisfied.  Once 1926(b) protection is in place, the TCEQ cannot grant any CCNs without the approval of the USDA.  *See* 7 C.F.R. §§ 1951.226 & 1951.232.

Plaintiff argues that the 1992 contract constitutes an agreement in writing qualifying under § 13.255(a).  Wellborn contests the validity of that contract on the grounds that it has never been approved by the TCEQ and allegedly conflicts with § 1926(b).  There is no guarantee that the

contract will be upheld in the state court litigation.  Nor is there any guarantee that the parties will

be able to reach an agreement in the future that they can submit to the TCEQ.  Thus, the only means

that the Plaintiff could use to obtain a CCN is the process outlined in § 13.255(b)-(l).

      With USDA and state regulatory approval, the Plaintiff theoretically has the ability to

purchase the right to serve the areas it has annexed.  The method outlined in 13.255(b)-(l) is  a

means of exercising eminent domain.  That is, under § 13.255(b)-(l), the commission can designate

the Plaintiff as the sole provider of retail water service for the area, so long as the Plaintiff pays for

the right to provide services.  With respect to real property, § 13.255(g) states that for the purposes

of implementing § 13.255, "the value of real property shall be determined according to the standards

set forth in Chapter 21, Property Code, governing actions in eminent domain."  TEX. WATER CODE

ANN. § 13.255(g).  With respect to personal property, § 13.255(g) lists factors that the commission

must consider to ensure that the "*compensation* to a retail public utility for the *taking*, damaging,

and/or loss of personal property, including the retail public utility's business, is just and adequate."

TEX. WATER CODE ANN. § 13.255(g).  *Id.* (emphasis added).

      In *City of Madison*, the plaintiff city instituted eminent domain proceedings to condemn a

water association's facilities that were located within the city limits and also the water association's

CCN.  816 F.2d at 1058.  The Fifth Circuit held that the plaintiff was precluded from condemning

such property through eminent domain during the term of the association's indebtedness to the

FmHA.  *Id.* at 1059.  The court reasoned as follows:

> The statute unambiguously prohibits any curtailment or limitation of an
> FmHA-indebted water association's services resulting from municipal annexation
> or inclusion.  This language indicates a congressional mandate that local
> governments not encroach upon the services provided by such associations, be that
> encroachment in the form of competing franchises, new or additional permit
> requirements, or similar means.  To read a loophole into this absolute prohibition, as
> Madison would have us do, and allow a city to do via condemnation what it is
> forbidden by other means, would render nugatory the clear purpose of § 1926(b).

*Id.* Based upon the Fifth Circuit's reasoning, the Court finds that § 1926(b) prevents the Plaintiff from acquiring a CCN through § 13.255(b)-(l) unless the USDA approves an action by the TCEQ granting certification.

In sum,  § 13.255 provides no guarantee that Plaintiff will be able to overcome Wellborn's § 1926(b) protection.  The Court is thus of the opinion that it will suffer irreparable injury if the loan is funded and Wellborn receives § 1926(b) protection.

## IV.    Threatened Injury to the Plaintiff Versus the Threatened Harm the Injunction May Do to Defendant

Wellborn stated that it needs the Federal Defendants' bond proceeds to pay for the interconnection line, which it claims is of critical importance to meet its upcoming peak water supply days.  It argues that, without the interconnection line, Wellborn customers are at risk of water supply shortages which could occur as soon as this summer.  Despite these assertions, Wellborn indicated at the hearing that it will obtain interim financing for its project regardless of whether or not the Court enjoins the funding of the loan.  There was also conflicting evidence at the hearing regarding the accuracy of the capacity of Wellborn's wells.  Specifically, there is a factual dispute over whether Wellborn's capacity is as low as it claims.  Moreover, if there is a dire need, Wellborn is connected to the City and can easily purchase water at retail rates.  Finally, even the Federal Defendants have stated that a review of the merits would not take a long time to resolve.  A temporary injunction would thus not seriously delay the funding that Wellborn desires or harm its residents.

On the other hand, the threat to the Plaintiff if it does not receive a preliminary injunction is that the loan will be funded, the § 1926(b) protection will be automatic, and it will lose the right to challenge that loan and its effects for 40 years.  The effect of the § 1926(b) protection may stifle the Plaintiff's growth and ability to develop.  The Court is of the opinion that the Plaintiff will suffer

33

an immediate injury if the loan is funded.  Comparing the time frame of a 40-year detriment to the

Plaintiff with the few months delay of a construction project to Wellborn, the threatened immediate

injury to the Plaintiff outweighs the threatened harm a preliminary injunction may do to Wellborn.

## V.      Disservice of the Public Interest

The Court is of the opinion that granting the preliminary injunction will not disserve the

public interest.  The evidence at the hearing indicates that Wellborn will have access to water in the

event of an emergency shortage.  Thus, it does not appear that the public interest will be disserved

if the Court issues a preliminary injunction.

### Conclusion

Based upon the foregoing, the Plaintiff has satisfied all four prerequisites for preliminary

injunctive relief.  Accordingly, a preliminary injunction is GRANTED.  USDA, RUS, and Wellborn,

their officers, employees, attorneys and representatives, agents and anyone acting in concert with

them are enjoined from taking any action to proceed with the consummation of the loan to construct

a twelve inch water main to connect Wellborn with Brushy WSC and to install radio read water

meters in Wellborn or with the issuance of any bonds for those purposes to be sold to USDA or RUS

until further order of the Court.

It is so ORDERED.

Signed this 17th day of October, 2005.


JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

34